## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **MATT JOHNSON, PLUMBERS &** | ) | |
| **STEAMFITTERS LOCAL NO. 43** | ) | |
| **HEALTH AND WELFARE FUND, and** | ) | |
| **PLUMBERS & STEAMFITTERS** | ) | |
| **LOCAL NO. 43 PENSION FUND,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:23-cv-00273** |
| | ) | **Judge Aleta A. Trauger** |
| **CRANE NUCLEAR PFT CORP.,** | ) | |
| **CHRIS MITCHELL, and the** | ) | |
| **TENNESSEE VALLEY AUTHORITY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM

Before the court are three Motions for Partial Summary Judgment—one filed by the plaintiffs, the Plumbers & Steamfitters Local No. 43 Health and Welfare Fund and the Plumbers & Steamfitters Local No. 43 Pension Fund ("plaintiff Funds") and Trustee Matt Johnson (Doc. No. 66); one filed by defendant Tennessee Valley Authority ("TVA") (Doc. No. 75); and one filed jointly by defendants Crane Nuclear PFT Corp. ("Crane") and Chris Mitchell (Doc. No. 81). The sole issue presented by the parties' motions is a legal one: the appropriate interpretation of a collective bargaining agreement, although each party frames the inquiry somewhat differently. More specifically, the question is whether Crane is required by the collective bargaining agreement and a separate contract with TVA to make certain contributions to the plaintiff Funds.

For the reasons set forth herein, the defendants' motions will be granted and the plaintiffs' motion will be denied. Because resolution of the defendants' motions in their favor is dispositive

of all of the plaintiffs' claims, judgment will be entered in favor of the defendants, and this case will be dismissed.

## I.      LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, inter alia, "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials"—that it believes demonstrate the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009); *Taft Broad. Co. v. United States*, 929 F.2d 240, 241 (6th Cir. 1991). On cross-motions for summary judgment, "the court must evaluate each party's

motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft*, 929 F.2d at 248.

## II.    FACTS[1]

### A.    The Parties

The plaintiff Funds are an employee welfare benefit plan and an employee pension benefit plan, respectively, within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1002(1), (2)(A), and (37). (Doc. No. 41, First Am. Compl. ("FAC") ¶ 9.) Plaintiff Matt Johnson is a trustee and fiduciary of the plaintiff Funds. (*Id.* ¶ 4.)

TVA is a wholly owned United States federal government corporation created by Congress in 1933. TVA is engaged in producing, distributing, and selling electrical power throughout the southeastern United States. 16 U.S.C. § 831d(1).

Crane is a contractor that provides valve services in the nuclear industry. More specifically, it is a company that has contracted with TVA to perform "valve work" during "refuel outages" at TVA nuclear plants. (Doc. No. 103-1, Faulkner Dep. 9, 19.) As explained in greater detail below, Crane's predecessor entered into a contract with TVA in June 2021—Contract 16051—for the provision of valve services at TVA's nuclear sites for the five-year term covered by the contract. Chris Mitchell is President of Crane.[2]

---

[1] All facts stated herein are undisputed unless otherwise indicated. The facts for which no citation is provided are drawn from the pleadings (Doc. Nos. 41, 44, 58), the plaintiffs' Responses to the defendants' separate Statements of Undisputed Material Facts (Doc. Nos. 92, 93), and the defendants' Responses to the plaintiffs' Statement of Undisputed Material Facts (Doc. Nos. 79, 80).

[2] The plaintiffs do not seek summary judgment against Mitchell, asserting that "an award of summary judgment against Defendants Crane and TVA will afford Plaintiffs complete relief" (Doc. No. 67 at 1 n.1) and, moreover, that "resolution of Plaintiffs' claims against Mitchell will require the Court to determine his status as a fiduciary, a fact-intensive inquiry beyond the scope of all the motions for partial disposition filed by the parties" (Doc. No. 89 at 2 n.1).

**B.     The PMMA**

TVA is a party to a collective bargaining agreement with the Tennessee Valley Trades and Labor Council ("Council"), known as the Project Maintenance and Modification Agreement ("PMMA").[3] The Council is composed of fifteen international trade unions, including the United Association of Journeymen and Apprentices of Plumbing and Pipe Fitting. (PMMA at ii.) The PMMA was signed in 2015 and was anticipated to be "in full force and effect" through at least November 30, 2021, but it continues in effect thereafter year to year unless terminated by either party. (*See* PMMA Art. XXVII at 30, Art. XXVI at 26.)

Although the PMMA was negotiated among, and executed by, TVA and the Council representatives (presidents of each of the fifteen unions),[4] the parties' intent in executing the agreement was that all subsequent contracts between TVA and any third-party contractor for the performance of "maintenance and modifications work" (as defined by the PMMA) at any TVA facility would be governed by the PMMA and that such contractors would be required to "sign, accept, and be bound by the terms and conditions" of the PMMA in order to contract with TVA to perform maintenance work. (*Id.* at Art. V at 14; Art. VI at 9; Art. I at 26.) Thus, although TVA was the signatory, nearly all of the PMMA's provisions govern the putative "Contractor's" rights and obligations in relation to "rates of pay, hours of work, and conditions of employment" for the workers engaged by the Contractor to perform work for TVA that falls within the scope of the PMMA. (*Id.* at Art. I at 26; *see also id.* at Art. XXVII § 1 at 26 ("[T]his [PMMA] governs the respective rights and obligations of the Contractor and the Council covering the Contractor's

---

[3] Each party has filed the PMMA multiple times, so it appears several places in the docket, including, *e.g.*, at Doc. Nos. 1-3, 67-3, 76-1, and 82-1.

[4] Other signatories included the President and the Secretary-Treasurer of North America's Building Trades Unions ("NABTU") and an "Administrator" for TVA, the Council, and NABTU. (PMMA at 30.)

employees[.]").) Thus, for example, Article II ("Management Rights") defines the Contractor's authority to plan, direct, and control the operation of the work, to assign and move employees within the job site, to hire, lay off, and discipline employees, and so forth. Article III sets forth the Contractor's recognition of the Council as the bargaining representative for "craft employees"[5] of the Contractor on a project and requires each Contractor who signs the PMMA to "contact the Council Office to report their project's scope of work, begin date, staffing needs, etc., at least ten days . . . before beginning work." (PMMA Art. III § C.) If the labor cost on the project is expected to exceed $100,000, the Council may require the Contractor to conduct a pre-job conference or pre-job "brief." (*Id.*; *see also* Doc. No. 104-1, Trumm Dep. 15 (explaining that a "pre-job" brief is "a meeting . . . with [TVA's] 15 union reps and the administrator of the Council where . . . the contractor . . . goes over the aspects of the work that they're set to perform for TVA [and] who is going to perform what work from what union," and they "go over the safety plan and then the work plan with all of our union partners for work that is covered under the agreement").)

Article VII sets forth a mandatory "Grievance Procedure" for any employee seeking to challenge termination or suspension. Article XII and Exhibits A and C to the PMMA govern wages and pay schedules and require the Contractor to "make health and welfare and pension trust fund contributions to the applicable fund, as identified by the Council"—presumptively including the plaintiff Funds, assuming they are designated by the Council as the applicable funds for a particular job. (Article XII ¶ 2.) This provision also specifies that,

> [w]here a Contractor's required contributions to the applicable health and welfare
> and pension trust funds are different than that specified in Exhibit A or Exhibit C,
> the Contractor shall change its wage payment by an amount sufficient to make the

---

[5] "Craft" employees are union members and thus represented by their specific union and by the Council.

total of wages plus any applicable travel or subsistence, health and welfare, and pension contributions equivalent to that specified in Exhibit A and Exhibit C.

(*Id.*)

The PMMA defines the "scope of work" covered by the agreement as follows:

1. This Agreement covers only that maintenance and modifications work assigned by [TVA] to the Contractor and performed by the employees of the Contractors covered by this Agreement.

2. *This Agreement does not cover work classified as specialty work as defined by [TVA]*.

(PMMA, Art. V (emphasis added).) "Modification and maintenance work" is broadly (and tautologically) defined as "work of a maintenance and modifications nature that requires the use of laborers and mechanics for maintenance, renovation, modification, addition, and/or repair to existing plants and transmission facilities," all of which is deemed to "fall under this Maintenance and Modification Agreement." (PMMA, Art. VI ¶ 1.) "All work that is directly related to the mechanical operation of the plant and does not involve addition of new capacity shall be considered maintenance or modification." (*Id.*)

"Specialty work," on the other hand, is defined narrowly as "work not normally performed by a General Contractor and requiring specialized knowledge, skills, or equipment operation not normally possessed by the craft and referable out of the Union halls." (*Id.* Art. VI § 2.) Under the agreement, TVA is required to "work with the Council to assist in training which will result in the development of such specialized skills with the work force." (*Id.*)

Aside from that directive, TVA's obligations under the PMMA are set forth primarily in Article XXVII, which states in relevant part:

TVA and the [Council] agree that each contract in excess of $250,000 for TVA's Fossil, Nuclear, and Hydro organizations or $350,000 for all other TVA organizations for work involving the maintenance or modification of TVA facilities and which requires the employment of laborers and mechanics in such work shall contain a provision requiring the Contractor to become signatory to this Project

Maintenance and Modification Agreement. *This requirement shall apply only to that maintenance and modification contract work which falls within the scope of work and definitions outlined in Articles V and VI and does not apply to Specialty Contracts as defined in Article VI of this Project Maintenance and Modification Agreement.*

. . . .

Disputes regarding the applicability of this Section 2 shall be handled as follows:

*If TVA determines that a particular contract which otherwise would be covered by this Project Agreement is excepted from coverage under this section, it shall notify the Council before the contract is awarded.* Any Council disputes regarding this determination must be received by a person designated by TVA within three workdays of the Council's receipt of notification. If TVA and the Council cannot resolve this dispute, the Council may appeal the dispute to an arbitrator . . . within five workdays of TVA's receipt of the Council's initial dispute.

(PMMA Art. XXVII § 2 (emphasis added).) Importantly, this provision does not require written notification by TVA. Subsequent paragraphs of Article XXVII outline the dispute resolution process to be followed if the Council disagrees with TVA's designation of a "particular contract" as excepted from coverage under the agreement. (*Id.*)

## C. TVA's Designation of Valve Work as "Specialty" Work

"Valve work" generally entails the "fitting of a 'cap' on the head of a nuclear reactor." (Doc. No. 78-2, Trumm Decl. ¶ 5.) TVA Vice President for Labor Relations William Trumm further explained that "[t]o close the head of a nuclear reactor requires . . . very specific valve placement" and that, if valve placement is done incorrectly, the head of the reactor cannot close, which can lead to extended power outages and even to catastrophic safety issues. (Doc. No. 104-1, Trumm Dep. 8, 21.)

TVA historically assigned valve work to one of the Council's local unions, the United Association of Plumbers & Steamfitters, Local 43 ("Local 43"), but, after "valve failures for several years in a row," costing TVA "several millions of dollars," TVA concluded that Local 43 was unable to perform the work satisfactorily. (Trumm Dep. 20–21.) TVA decided that valve work

was "specialty work" that could be performed by non-union workers. (*Id.* at 21–22.) According to Trumm, TVA and the Council administrator agreed that valve work would be classified as specialty work. He did not recall when they reached this agreement but believed it was in 2017 or 2018. (*Id.* at 22–24.) He explained that this type of decision is not typically put in writing but occurs in oral conversations. (*See id.* at 24 ("TVA makes that declaration to the administrator of the council . . . [a]nd then we agree on it. And then their job is to go back and . . . talk . . . to the unions about what's occurred.").) According to Trumm, this process triggers the unions' right to appeal, but the Council never challenged TVA's designation of valve work as specialty work. (*Id.*)

Trumm also made it clear that TVA decided to declare valve work as specialty work before it contracted with Crane to perform the valve work, as discussed below. (*Id.* at 27.) The decision was made at some point when the contractor before Crane was engaged to do valve work. Trumm did not recall when exactly TVA notified the Council, but he believed it was in 2018 or 2019. (*Id.*) Asked whether TVA then gave the Council notice again before contracting with Crane that it deemed the Crane contract to be a specialty contract or whether "that notice carr[ied] through," Trumm stated, "Once work from TVA is deemed to be specialty work . . . until which time something would take it out of the realm of specialty work, it would be considered to be specialty work." (*Id.* at 27–28.)

Asked whether he understood the PMMA to require TVA to give notice to the Council "if the contractor changes but not the work itself," Trumm explained:

> Our union administrator knows every outage season that this work was being performed. So when we talk about providing the notice of specialty each time, the answer would be every time that we performed this work, the union hall and the administrative council knew the work was being performed [and], at any point, could have utilized the contractual mechanism of saying, hey, we think that we should be performing said work or we would like to take it to an arbitration case, which is their right inside of our . . . agreement. And zero times did . . . the

administrative council ever protest[] whether or not this work was or was not specialty work.

It was accepted by the administrator that . . . this specific valve work was specialty work.

(*Id.* at 28–29.)

Asked whether TVA notified the Council as required by the PMMA prior to contracting with Crane in 2021, Trumm replied, "Yes, plenty of times. Probably 15 to 17 times prior to this." (*Id.* at 31.) He elaborated that "TVA is providing notice consistently to the council by the way that we performed the work that this was deemed specialty work. . . . TVA did provide notice multiple times, every time that we did the evolution [sic] of the work that it was deemed specialty work at each point." (*Id.* at 31–32.)

Asked what date TVA gave the Council notice that the valve work was deemed specialty work, Trumm testified that he could not provide a date and did not "know if that date exists, because . . . TVA's practice with our council administrator for multiple administrators now for multiple years" has been to communicate by telephone or in person. (*Id.* at 33.) According to Trumm, "[w]e have conversations all the time on specialty work. And this was handled no differently than any other specialty work for TVA." (*Id.* at 34.) He identified the Council administrators with whom he has communicated:

The . . . first administrator I remember having conversation on Crane valves was Kevin Adkisson. . . . [T]hen it would have been Brandon Bishop, and then it would have been Glenn Kelly would be three administrators that I know of that have had the conversation around a Crane valve from the union perspective. . . .

So we have had three administrators. All three administrators have agreed with TVA that this work was deemed specialty work.

(*Id.* at 42.)

Trumm further testified that, through negotiations with TVA, Crane offered training for steamfitters to become qualified to do specialty valve work, but none of the steamfitters from Local

43 availed themselves of that opportunity. (*Id.* at 36–37.) Also in evidence are letters exchanged in 2020 among TVA and representatives from the Council and the union that confirm Trumm's testimony. These letters discuss the fact that Local 43 members needed additional training to be able to do the required valve work at TVA's nuclear sites and, by that point, no union members had made any attempt to receive the additional training. (*See* Doc. No. 78-2 at 6 (July 28, 2020 Letter from M. McManus, General President of the United Association of Journeyman and Apprentices of the Plumbing & Pipe Fitting Industry, to S. McGarvey, NABTU President, noting that union members' need for valve work training had been brought to his attention and confirming that he was working with Crane and TVA to "update and expand UA training"); Doc. No. 78-2 at 8 (Sept. 15, 2020 Letter from Trumm to McManus, acknowledging UA's commitment to "work with TVA and Crane Services" to provide union members "advanced valve training" but also noting that TVA had not yet "seen any productive actions, or attempts to address skills gaps regarding valve repair, even after repeated offers of training to UA local members" and that, "[a]bsent any near-term actions by the UA to address these [skill] gaps, TVA will again be forced to utilize other resources to provide qualified and proficient personnel to perform work during our refuel outages").)

### D. Contract 16051

In June 2021, TVA and Crane's predecessor, Crane Nuclear, Inc., entered into Contract 16051 for "Safety and non-safety Valves, Field Services and Outage Valve Services." (*See* Doc. No. 85-2, Contract 16051 at 1.) The contract term is five years from the "Effective Date," meaning it runs from June 18, 2021 through June 17, 2026. (*Id.* at § 3.1 and p. 52.) The scope of work to be performed by Crane for TVA is defined by the agreement as:

> valve refurbishment, positioner set up and calibration, strain gauge installation and calibration, diagnostic testing, inspections, cleaning, seat lapping, packing, pressure/level/flow transmitter calibration, troubleshooting and maintenance at

TVA nuclear sites," as further described in Attachment D to the contract and individual Work Releases issued by TVA and accepted by Crane during the contract term.

(*Id.* § 2.1.) Under this contract, Crane is to perform "valve work" during "refuel outages" at TVA nuclear plants. (Doc. No. 103-1, Faulkner Dep. 9, 19.)

Crane and TVA require specific qualifications and training for individuals to perform this type of nuclear valve work. Trumm testified that "the specific valve work that Crane was performing under the specialty work provision was deemed to be specialty work." (Trumm Dep. 29–30.) Further, according to Matthew Faulkner, TVA's Director of Labor Relations, the valve work performed by Crane at the TVA nuclear facilities "consists of work not normally performed by members of [Local 43], as it requires special knowledge, skills, and training the Union members do not have." (Doc. No. 78-1, Faulkner Decl. ¶ 7.)

When asked during his deposition whether any work within the scope of work to be performed under Contract 16051 was not specialty work, Faulkner explained: "In this situation, the way TVA would determine this is the contract itself . . . . The contract itself would rise to the level of specialty work." (See Doc. No. 103-1, Faulkner Dep. 148–49.) (*Id.* at 149.) Thus, although some of the work under the contract could be performed by "craft" (union) personnel, which Contract 16051 specifically anticipated,[6] the contract itself was a specialty contract not covered by the PMMA. (Faulkner Decl. ¶¶ 9–11.) According to Trumm, TVA provided notice to the Council that Crane would be performing specialty valve work every outage season during Crane's contract so far. (Trumm Dep. 28–29, 42–43.)

---

[6] Attachment D to Contract 16015, "Scope of Work," states "Contractor's . . . qualified craft and non-craft personnel will perform a broad range of managed task Valve Services at the TVA Site(s). . . . Contractor will maintain an appropriate staffing mix of Craft Personnel . . . Non-craft Personnel, consistent with the nature of and requirements for the Work being performed." (Doc. No. 78-1 at 67.)

Section 9.1(a) of 16051, under the heading "Labor Provisions," states:

Contractor and Contractor's Subcontractors shall comply with the latest version of labor provisions which are applicable to this Contract:

1. Form TVA 1851 (with Exhibit A)

2. Form TVA 1851 (with Exhibit S1)

3. Project Maintenance and Modifications Agreement (PMMA)

(Contract 16051 § 9.1(a.).)

The language of this clause could ostensibly mean either that all three of the listed items are "applicable to this Contract" and, therefore, that the Contractor must comply with all three of them, or that the Contractor was required to comply with whichever of the listed items is applicable to the Contract. The language of the listed documents makes it clear, however, that only one of them could apply in any given situation. As TVA's 1851 Package instructions explain, different forms and wage schedules apply depending on the type of construction at issue and the threshold value of the contract. (*See* Doc. No. 82-8 at 2–5.) Generally, however, Exhibit A to Form TVA 1851 is the wage packet that pertains to contracts for specialty work, "[r]egardless of the dollar amount involved," and to contracts for the construction or modification of a new or existing plant that fall below a certain dollar threshold. (*Id.* at 3, 5.) The Exhibit A Wage Schedule requires that contractors pay the prevailing rate of wages but it does not require contributions to "fringe" benefit funds. Under Schedule A:

The wages and fringe payments listed in this document are the total of payments that should be made for each [job] classification, except that monies within the wage package can be moved between wages and fringes so long as the total of the wage package remains the same.

(*Id.* at 3.) In other words, as Trumm, explained, contractors

have to pay the wage package even through the 1851 . . . . [T]hey pay the same wages regardless, because TVA doesn't give any benefit to a nonunion contractor [that it doesn't give] to a union contractor. So we negotiate wages at TVA. Whether

or not you come under the PMMA or you have to follow the 1851, the wage package never changes. It's the same wage package for anyone who is performing work across the Valley.

(Trumm Dep. 57.) The difference appears to be that the amount that would go into a Fund under the PMMA is paid through increased wages to the employees (whether union or not) under a specialty contract. The Exhibit S-1 Wage Schedule pertains to the construction and maintenance of office buildings, as distinct from plant facilities, and the PMMA applies only to maintenance contracts that meet a certain dollar threshold and that do not involve specialty work. (*See* Doc. No. 82-8 at 5.)

There is no dispute that, during the term of Contract 16051, Crane has not made contributions to the plaintiff Funds and apparently understands Contract 16051 as governed by Form TVA 1851 and Exhibit A. The Council and the Union have never objected. Crane has made manpower requests to Local 43 during the contract term. (Doc. No. 68, Johnson Decl. ¶ 2.)[7] The record does not indicate whether any union members responded to the requests.

### E.       Procedural history

The plaintiffs filed suit against Crane and Mitchell in March 2023, asserting that Crane has failed to make contributions to the plaintiff Funds as required by the PMMA and that Mitchell, as a fiduciary, is liable to the Funds for breach of fiduciary duty. (Doc. No. 1.) The plaintiffs amended their pleading in May 2024 to add TVA as a defendant. (Doc. No. 41.) From Crane, they seek to collect unpaid contributions to the Funds and to receive a prospective injunction requiring Crane to continue making contributions to the Funds in connection with future TVA work; as to TVA, they seek a declaration "defining the specialty work provisions of the PMMA." (*Id.* at 8.)

---

[7] The form requesting manpower attached to Johnson's Declaration specifically describes the work to be performed as "Outage Valve services for Specialty work pursuant to the Crane Nuclear PFT contract with TVA." (Doc. No. 68-1.)

After obtaining the court's approval, the parties conducted limited discovery before filing their Motions for Partial Summary Judgment on the issue of liability. The plaintiffs filed a Memorandum of Law and separate Statement of Undisputed Material Facts in support of their motion (Doc. Nos. 67, 71), along with several declarations, deposition excerpts, the contracts at issue here, and other documents on which they rely. The defendants each filed their own Memorandum of Law in support of their own positions and in opposition to the plaintiffs' position (Doc. Nos. 76, 82), their own separate Statements of Undisputed Material Facts and Responses to the Plaintiffs' Statement of Undisputed Material Facts (Doc. Nos. 79, 80, 83) and the evidentiary material on which they rely. The plaintiffs filed a single Response to the defendants' motions that is also a Reply in further support of their motion (Doc. No. 89), and the defendants also filed Reply briefs (Doc. Nos. 97, 100).

## III.    DISCUSSION

### A.    The Parties' Arguments

The plaintiffs argue that ERISA governs this dispute and that, under 29 U.S.C. § 1145, a benefit fund makes out a *prima facie* case for the recovery of unpaid pension fund contributions by "showing that a statutory employer, who had an obligation to make contributions to the fund under either a [collective bargaining agreement] or the terms of the plan itself, failed to make those contributions." (Doc. No. 67 at 6.) The plaintiffs assert that the "only dispute between the parties is whether Crane is 'obligated . . . under the terms of . . . a collective bargaining agreement.'" (*Id.* (misquoting 29 U.S.C. § 1145).)

They contend that, under the unambiguous language of the PMMA, for any maintenance and modification contract, TVA must provide the Council "effective pre-award notice" of a determination by TVA that a particular contract falls within a limited exception, as outlined by Article XXVII of the PMMA, and that, if TVA does not provide such notice that a contract

"otherwise covered" by the PMMA is excluded, then the contract, by default, is not a specialty contract and is subject to the PMMA. (Doc. No. 67 at 9.) And, they contend, that is what happened here. The Crane contract is a maintenance contract that is presumptively covered by the PMMA; TVA did not provide notice in accordance with Article XXVII that it considered Contract 16051 to be a specialty contract; and, as a result, TVA's claim now that the contract is a specialty contract is "ineffective" because "not made pursuant to the procedure outlined in the PMMA." (*Id.*)

The plaintiffs also argue that courts construing ERISA have made it clear that plans seeking to enforce benefit plans are entitled to rely on the plain language of the contracts. (*Id.* at 14 (citing *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 108 (2013)); *Trs. of Sheet Metal Workers Loc. 7 Zone 1 Pension Fund v. Pro Servs., Inc.*, 65 F.4th 841, 847 (6th Cir. 2023); *Bakery & Confectionery Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co.*, 133 F.3d 955, 959 (6th Cir. 1998)).)

The defendants' position is that ERISA does not apply, because Crane has no contractual obligation to contribute to the Funds that the Funds can enforce. They assert that TVA has the exclusive right to designate work as "specialty work," that it designated valve work as "specialty work," and that it notified the Council that union members would not be able to perform the work until they became qualified to do so. (*See* Doc. No. 76 at 2.) The defendants maintain that the Council was thus notified that TVA had designated valve work as specialty work and that the Council has never filed a grievance or otherwise challenged TVA's decision to so designate valve work or to award the valve contract to Crane and, as a result, Crane was not required to execute the PMMA or to make contributions to the plaintiff Funds. (*Id.*; *see also* Doc. No. 82 at 2.)

The defendants do not actually concede that TVA was obligated to give notice to the Council under Article XXVII ¶ 2 of the PMMA that Contract 16051 is a specialty contract, but

they argue that, even assuming that provision applies, TVA gave the Council ample and repeated notice, before contracting with Crane, that the valve work at issue was specialty work, making the contract for valve work a specialty contract.

## B.    Section 515 of ERISA

"When collective-bargaining agreements create pension or welfare benefits plans, those plans are subject to rules established in ERISA." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 434 (2015). Under § 515 of ERISA,

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. ERISA also empowers plan fiduciaries to bring civil actions to enforce this provision. 29 U.S.C. § 1132(a)(3), (g)(2); *Operating Eng'rs Loc. 324 Fringe Benefit Funds v. Rieth-Riley Constr. Co.*, 43 F.4th 617, 619 (6th Cir. 2022).

Courts "interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *Operating Eng'rs Loc. 324*, 43 F.4th at 619 (citing *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456–57 (1957). As with any contract, "the parties' intentions control," but that intention is derived from the plainly expressed contract terms, at least where the written contract is "clear and unambiguous." *Id.* at 435 (citations omitted).

"'Where a contract's meaning is clear on its face, that meaning controls. Where a contractual provision is subject to two reasonable interpretations, however, that provision is deemed ambiguous, and the court may look to extrinsic evidence' to help construe it." *Pro Servs., Inc.*, 65 F.4th at 549 (quoting *In re AmTrust Fin. Corp.*, 694 F.3d 741, 750 (6th Cir. 2012)) (some internal quotation marks omitted). "Whether a contract term is ambiguous is a question of law for

the court to determine." *Id.* (quoting *Nw. Ohio Adm'rs, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1025 (6th Cir. 2001)).

Generally speaking, fringe benefit funds "are entitled to rely on the written terms of an existing ERISA plan document or collective bargaining agreement." *Operating Eng'rs Loc. 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1053 (6th Cir. 2015) (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1153 (7th Cir. 1989)). In other words, "multi-employer trust funds are entitled to rely on an employer's promises to make contributions to the funds, irrespective of any breach or omission by the union." *Id.* (citation omitted). If an employer/contractor "knowingly signs an agreement that requires him to contribute to an employee benefit plan, he may not escape his obligation by raising defenses that call into question the Funds' ability to enforce the agreement." *Id.* (internal quotation marks and citations omitted)). Consequently, even a settlement between a union and an employer absolving the employer of an obligation to pay contributions it owes to a pension fund will not "affect the Funds' right to collect contributions that are due and owing to the Funds." *Id.*; *accord Sheet Metal Workers' Health & Welfare Fund v. Stromberg Metal Works, Inc.*, 118 F.4th 621, 632 (4th Cir. 2024) ("[S]ettlement agreements between [the union and the employer] are not binding on the plaintiff Funds nor do they preclude the Funds from seeking delinquent contributions from [the employer].").

At the same time, however, pension funds are not parties to collective bargaining agreements and instead "stand as third-party beneficiaries" to such agreements. *Orrand v. Scassa Asphalt, Inc.*, 794 F.3d 556, 563 (6th Cir. 2015). Third-party beneficiaries "take contracts as they find them. They get no more than the signatories provided, and if there is a flaw in the formation of the contract the third-party beneficiaries get nothing." *Gerber Truck Serv.*, 870 F.2d at 1151.

### C.     Interpretation of the Contract

The PMMA unambiguously states that it "does not cover work classified as specialty work" by TVA. (PMMA Art. V ¶ 2.) And it defines specialty work as "work not normally performed by a General Contractor and requiring specialized knowledge, skills, or equipment operation not normally possessed by the craft [union workers] and referable out of the Union halls." (PMMS Art. VI ¶ 2.) TVA has an obligation to work with the Council to train union workers to develop such specialized skills so that, eventually, by implication, the specialty work would no longer require "specialized knowledge [or] skills . . . not normally possessed" by union workers. (*Id.*) As TVA and Crane argue, this provision says nothing about notice—it simply gives TVA unilateral discretion to identify work as specialty work outside the purview of the PMMA, so long as the work falls within the PMMA's definition of "specialty work."

TVA and Crane argue that specialty work and specialty contracts are not necessarily the same thing and that the notice provisions in Article XXVII were never even triggered in this case, because TVA had already predetermined that the valve work at issue was specialty *work* outside the purview of the CMMA. As set forth above, Article XXVII ¶ 2 pertains to "contracts" for "work." It requires that every contract between TVA and a contractor valued in excess of a threshold dollar figure "for work involving the maintenance or modification" of TVA facilities that "requires the employment of laborers and mechanics for such work" *must* include a provision requiring the contractor to become a signatory to the PMMA. (PMMA Art. XXVII ¶ 2.) At the same time, however,

> [t]his requirement shall apply only to that maintenance and modification *contract* work which falls within the scope of work and definitions outlined in Articles V and VI and does not apply to *Specialty Contracts* as defined in Article VI of this Project Maintenance and Modification Agreement.

(*Id.* (emphasis added).) This provision is somewhat confusing, insofar as it refers to "maintenance and modification *contract* work" within the definition in Article V and "Specialty *Contracts* as defined in Article VI," when Articles V and VI only concern and define "maintenance and modifications *work*" and "specialty *work*." (*Compare* PMMA Arts. V & VI ¶¶ 1–2 *with* Art. XXVII ¶ 2.) Article XXVII goes on to provide for the resolution of any dispute between the Council and TVA as to TVA's "determin[ation] that a particular contract which otherwise would be covered by this [PMMA] is excepted from coverage under" Article XXVII ¶ 2. (*Id.*) The dispute resolution paragraph states, as relevant here:

> If TVA determines that a particular contract which otherwise would be covered by this Project Agreement is excepted from coverage under this section, it shall notify the Council before the contract is awarded. Any Council disputes regarding this determination must be received by a person designated by TVA within three workdays of the Council's receipt of notification. If TVA and the Council cannot resolve this dispute, the Council may appeal the dispute to an arbitrator . . . .

(*Id.*)

The defendants ask the court to interpret these provisions together to mean that, once TVA determines that particular work is deemed "specialty work" under Article VI, then, by definition, Article XXVII does not apply, because it expressly exempts "Specialty Contracts as defined in Article VI." (*See* Doc. No. 76 at 21 (arguing that notice "is not a prerequisite for specialty work to be classified as such").) And, the defendants conclude, because Contract 16051 was a specialty contract covering specialty work, TVA was never subject to the notice provision in the dispute resolution provisions of Article XXVII. (*See* Doc. No. 100 at 6 ("Nowhere in these defining, threshold portions of the PMMA, which define specialty work, is TVA required to provide notice to the Council. That is, as long as work meets the [Article VI] definition, it is specialty work and falls outside the PMMA's coverage.").)

In the alternative, the defendants argue that TVA *did* give notice before contracting with Crane in 2021 that it deemed valve work to be specialty work that Local 43 union members were not trained or qualified to perform, and neither the Council nor the union leaders ever objected to that designation. The plaintiffs, on the other hand, argue that, pursuant to the plain language of the PMMA, TVA's failure to provide pre-award notice in accordance with Article XXVII means that the Crane contract is not a specialty contract and, therefore, that Crane must contribute to the Funds in accordance with the PMMA. (*See* Doc. No. 67 at 13 ("Because TVA did not properly designate the Contract [16051] as specialty work prior to its execution, the valve work performed by Crane pursuant to the Contract is subject to the PMMA, and Crane was required to make contributions to the Plaintiff Funds for their employees' work under the Contract.").)

The court rejects both parties' proposed interpretations of the PMMA as strained and contrary to its plain language. While the contract unambiguously grants TVA the discretion to determine that particular work is specialty work, the language of the PMMA as a whole cannot be construed as excusing TVA from notifying the Council that a particular contract is a specialty contract simply because it made a prior determination that the work involved is specialty work. Specialty work simply cannot be divorced from specialty contracts. The PMMA must be read and understood in its entirety. Given the PMMA's overall focus on *contracts* between TVA and third-party contractors, Article VI's definition of "specialty work" must be read as providing a definition that applies within the context of contracts for such work. This construction is bolstered by Article XXVII's reference to Article VI as defining "Specialty Contracts." The court finds that the PMMA unambiguously requires TVA to give pre-award notice to the Council any time it deems a particular contract that is for maintenance or modification work at a TVA facility—in other words, a contract "which otherwise would be covered" by the PMMA—to be "excepted from coverage"

because it is a contract for the performance of specialty work, which takes it outside the purview of the PMMA. This notice is what triggers the Council's three-day time limit for objecting to such designation. To read Article XXVII otherwise would make the contract as a whole nonsensical.

In this case, it is clear that Contract 16051 is for "maintenance and modification" work on existing TVA nuclear facilities that would "otherwise" be covered by the PMMA *unless* it is "excepted from coverage" as a specialty contract. (PMMA Art. XXVII ¶ 2.) While the contract does not require *written* notice,[8] TVA was required by the plain terms of Article XXVII to notify the Council in some fashion that Contract 16051 was deemed a specialty contract before it awarded that contract. There is no evidence in the record that TVA provided such notice specifically relating to Contract 16051 before awarding Crane that contract.

That said, the court also does not accept the plaintiffs' argument that TVA's failure to give notice in strict compliance with Article XXVII means that the contract at issue is not a specialty contract excepted from coverage by the PMMA. Nothing in the PMMA suggests that a failure to give notice strictly in compliance with Article XXVII means that the contract cannot be a specialty contract, and it is undisputed in this case that the contract at issue *is* a specialty contract and that TVA notified the Council many times, prior to awarding the Crane contract, that the valve work performed by Crane was specialty work. TVA, Crane, and the Council all apparently accept that valve work qualifies as specialty work for which Local 43 members lack the requisite training and qualifications, making Contract 16051 a contract for specialty work—that is, a specialty contract.

---

[8] The plaintiffs' Reply asserts both that written notice is required by ERISA and that written notice is not required by the terms of the PMMA itself. (*Compare* Doc. No. 89 at 5 ("There is no written document, as required by ERISA, that designates Crane's work as specialty work.") *with id.* at 11 n.6 ("[The defendants misstate Plaintiffs' position as requiring 'written' notice. Article XXVII(2) speaks for itself in that it does not prescribe the form of notice, written or oral." (internal citation omitted)).)

Although the PMMA does not provide a remedy for TVA's failure to comply strictly with the notice requirement, an appropriate remedy might have been to toll the time during which the Council could have objected to the designation. Notably, however, the Council would only need to seek such a remedy if (1) it had not otherwise received actual notice that the contract at issue was a specialty contract and (2) it objected to that designation. In other words, unless *both* of these propositions were true, then TVA's failure to comply strictly with the pre-award notice requirement would not cause the Council any injury for which a remedy should be fashioned.

The court finds it striking—and relevant—that the plaintiffs have access to the Council administrator and, in fact, have presented a Declaration from Glenn Kelly, current Council administrator, but they make no attempt to offer evidence, or to argue, that the Council did *not* receive actual notice before TVA contracted with Crane that the contract was a specialty contract or that, if the Council had received proper notice, it would have objected to that designation. As a result, the plaintiffs have not rebutted TVA's testimony regarding the repeated, actual notice it gave to the Council and union representatives that the valve work at issue in Contract 16051 was specialty work that union members were not qualified to perform.[9]

The court finds, in other words, that the issue presented here is not addressed by the cases cited by the plaintiffs holding that pension funds are not bound by oral agreements or settlement agreements between employers and unions that attempt to vary the terms of an employer's

---

[9] In the Declaration filed by the plaintiffs, Council Administrator Glenn Kelly attests to the resolution of a more recent dispute between TVA and the Council concerning "whether [TVA's] designation of a [particular] contract . . . was exempt from the PMMA pursuant to Article V and VI, as specialty work." (Doc. No. 69, Kelly Decl. ¶ 2.) In that situation, TVA provided written, pre-award notice in the summer of 2024—after this lawsuit was already pending—of its designation of a particular contract as a specialty contract. (Doc. No. 69-1.) But TVA's provision of such clear written notice *after* this lawsuit was filed is not relevant to the parties' practices when Contract 16051 was formed, and Kelly says nothing about the Council's position in this litigation.

contractual obligation to contribute to employee benefit funds. Here, the plaintiffs seek judgment as a matter of law that a notice requirement triggering dispute resolution provisions governs whether a contract should be deemed a specialty contract, irrespective of the parties' actual understanding that the contract is a specialty contract. The result the plaintiffs seek is not supported by the plain terms of the PMMA or the parties' understanding of Contract 16051, and the plaintiffs are not entitled to partial summary judgment as a matter of law on this issue.

Regarding the defendants' motions, while the court disagrees in part with their proposed interpretation of TVA's notice obligations under the PMMA, the defendants have presented unrebutted testimony that TVA and Crane deemed Contract 16051 to be a specialty contract, that TVA notified the Council repeatedly, beginning in 2018 and continuing at least through the fall of 2020, that it deemed the valve work performed by Crane to be specialty work that union members were not trained or qualified to perform, and that the Council and union have never objected to that designation (or to TVA's failure to comply with the notice provisions in Article XXVII of the PMMA). In short, TVA's failure to strictly comply with the notice provisions does not mean that Contract 16051 falls under the PMMA. The Council clearly received actual notice of the designation, and its decision not to contest it means that TVA's designation of the contract as a specialty contract remains in effect. Because the contract is a specialty contract, Crane was never obligated to become a signatory, and did not become a signatory, to the PMMA. The defendants are entitled to judgment as a matter of law.

## IV. CONCLUSION

For the reasons set forth herein, the plaintiffs' Motion for Partial Summary Judgment (Doc. No. 66) will be denied, and the defendants' Motions for Partial Summary Judgment (Doc. Nos. 75, 81) will be granted. Because Contract 16051 is a specialty contract that does not fall within the

scope of the PMMA, the defendants are entitled to judgment in their favor. An appropriate Order is filed herewith.

_____

ALETA A. TRAUGER
United States District Judge